UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROSALIND LAWRENCE, | : | Case No. 3:11-cv-2 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED

This is a Social Security disability benefits appeal. At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security

Income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 18-33) (ALJ's decision)).

**I.**

On June 23, 2003, Plaintiff applied for DIB and SSI, asserting that she was

disabled and could no longer work beginning June 1, 2002.[1] (Tr. 65-67). Plaintiff's

applications were denied at all levels of administrative review, including by an ALJ's

written decision dated February 16, 2007. (Tr. 18-33). After the Appeals Council

declined review, the decision was appealed to this Court. On July 22, 2009, Magistrate

Judge Ovington recommended that this case be remanded to the Commissioner for further

---

[1] However, Plaintiff had earnings of over $8,000 in 2007, over $10,000 in 2008, and more than $9,000 in 2009. (Tr. 739).

proceedings. (Tr. 753-75). Judge Rice issued an Order finding that the ALJ committed errors in applying the correct legal criteria to opinion evidence of record and in making assumptions regarding claimant's treatment history. (Tr. 768-773). Ultimately, this Court entered an Order remanding the case to the Social Security administration. (*See* Case No. 3:08cv303). (Tr. 776-777).

On April 14, 2010, an ALJ held yet another hearing. (Tr. 1200-15). On September 23, 2010, the ALJ issued a decision, finding that Plaintiff was not under a disability within the meaning of the Social Security Act and was therefore not entitled to receive benefits. (Tr. 349). Specifically, the ALJ found that Plaintiff was not disabled because she could perform both medium and light exertion jobs based on her residual capacity. (Tr. 747-48). Again, Plaintiff appealed the decision to this Court.

At the time of Plaintiff's hearing before the ALJ, she was considered a "younger person" for Social Security purposes at age 24. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c). As of April 14, 2010, Plaintiff had five children aged twelve, seven, six, four, and 3 months, and lived in a house with her boyfriend. (Tr. 1204). Plaintiff was in special education classes[2] and did not graduate from high school.[3] (Tr. 32, 73-140).

---

[2]    However, there is no evidence of mental retardation or even borderline intellectual functioning in her school records. (Tr. 22).

[3]    Plaintiff had her first child at age 14. The record indicates that Plaintiff quit school because her mother was going to "put her out of the house." (Tr. 23). The record presents conflicting evidence as to whether Plaintiff dropped out of school after 9th, 10th, or 11th grade.

Plaintiff worked in the past as a cashier at a gas station.[4] (Tr. 163).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2004.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following "severe" impairments: possible borderline intellectual functioning; illiteracy; history of alcohol and marijuana abuse; affective disorder; and anxiety disorder (20 CFR 404.1520 (c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at all levels of exertion with the following nonexertional restrictions: unskilled, simple, repetitive tasks; no reading requirements; no extended periods of concentration; no above average production quotas; and low stress jobs that are not fast paced.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant is twenty four years old and considered a "younger individual" (20 CFR 404.1563 and 416.963).

---

[4] Plaintiff maintains that she was only able to get and hold her cashier job because the father of one of her children was her manager. (Tr. 1212).

8. The claimant has a "limited education (7th to 11th grade - reports vary – and she was in special education). She can communicate in English (20 CFR 404.1564 and 416.964).

9. In view of the claimant's vocational profile and residual functional capacity, transferability of work skills is immaterial (20 CFR 404.1568, and Appendix 2, Subpart P, Regulations No. 4).

10. Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560 (c), 404.1566, 416.960 (c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through her date last insured of June 30, 2004, or through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-33).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to disability insurance benefits or supplemental security income. (Tr. 33).

On appeal, Plaintiff argues that: (1) the ALJ erred in failing to apply the correct legal criteria to the opinions of two treating sources; (2) the ALJ improperly relied upon presumptions, speculations, and suppositions rather than substantial evidence; (3) the ALJ erred by not applying the correct legal criteria to the largely consistent reports of two consulting examining psychologists; and (4) the ALJ erred by relying upon a false fact in determining that Plaintiff's report of symptoms lacks credibility. The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

Plaintiff has a history of mental health problems and was abused and neglected as a child. (Tr. 201). Plaintiff experienced both academic and social difficulties growing up.[5] (Tr. 199-202, 292, 295). Plaintiff's problems understanding and focusing caused her to make mistakes at her cashier job and lead her to seek assistance handling her own bills. (Tr. 701, 1211). Plaintiff hears voices and has suicidal thoughts. (Tr. 1209). She attempted suicide by pouring lighter fluid on herself and wrapping things around her neck.[6] (Tr. 1209-1210). Plaintiff drives only short distances and tries to avoid places she does not know.[7] (Tr. 704).

In June of 2002, Plaintiff was seen at Crisis Care where she was diagnosed with Posttraumatic Stress Disorder and Dysthymia.[8] (Tr. 284). She was instructed to obtain counseling and did so through Daymont. (*Id.*) At Daymont, Plaintiff reported hearing voices. (Tr. 285). She was diagnosed with Bipolar Disorder, Posttraumatic Stress Disorder, Psychotic Disorder, and Borderline Personality Disorder. (Tr. 286).

---

[5] Plaintiff's school testing records indicate "limited effort" and "poor motivation" and a serious absentee problem with school records showing absenteeism as high as 58 days absent and 60 days attended for one year alone. (*Id.*)

[6] However, in multiple mental health evaluations, Plaintiff failed to report any past attempts to harm herself or others. (*See, e.g.,* Tr. 853).

[7] Plaintiff notes that she has a driver's license and drives daily or every other day. (Tr. 20). Plaintiff maintains that she can read street signs but not street names. (Tr. 21). She indicates that she took an oral driving test. (*Id.*)

[8] Dysthymia is chronic depression in which a person's moods are generally low.

On July 17, 2002, Plaintiff saw Stephen Groce for a Mental Health Assessment Interview. (Tr. 285-86). Mr. Groce assigned a GAF rating of 65.[9] (*Id.*)

In August 2002, Plaintiff briefly participated in a partial hospitalization program. This hospitalization was primarily for supportive therapy while she was pregnant. (Tr. 23). Plaintiff entered the program on August 6, 2002 and was terminated on August 23 due to her failure to attend. (Tr. 631).

Plaintiff saw Dr. Jones for a psychological evaluation on November 11, 2002. (Tr. 289-95). Dr. Jones diagnosed Schizoaffective Disorder, Posttraumatic Stress Disorder, and Developmental Reading Disorder. (Tr. 293). Dr. Jones opined that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks was mildly impaired, but that she did not demonstrate any major problems of attention and concentration during the interview or in psychological testing. (Tr. 294).

On December 19, 2002, Dr. Casterline reviewed Plaintiff's records at the request of the state agency and concluded that Plaintiff was moderately limited in a number of functional areas and would "have some difficulty tolerating jobs which require close work with others" and with "frequent changes of job duties." (Tr. 311-313). Dr. Melvin

---

[9] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

similarly reviewed Plaintiff's records on October 13, 2003 and also concluded that

Plaintiff experienced moderate difficulties in social functioning, activities of daily living,

and maintaining concentration, persistence, and pace. (Tr. 328). He additionally

identified one or two episodes of decompensation. (Tr. 328). Dr. Melvin's findings were

confirmed by another agency reviewer in 2004. (Tr. 386).

Plaintiff began treatment at Samaritan Behavioral Health in April of 2003 and

again she reported hearing voices. (Tr. 380-385). She was noted to experience symptoms

of depression, hopelessness, helplessness, excessive worrying, isolation, suicidal ideation,

mood swings, irritability, anger, and paranoia. (Tr. 383). Plaintiff's therapist assigned

her a GAF of 40,[10] indicating some impairment in reality testing or communication or

major impairment in several areas. (Tr. 385). *See also* DSM-IV-TR at 34.

Dr. Songer served as Plaintiff's psychiatrist at Samaritan and diagnosed Plaintiff

with Major Depressive Disorder, recurrent, severe, with psychotic features and

Posttraumatic Stress Disorder. (Tr. 375). Dr. Songer also assigned Plaintiff a GAF score

of 40-45.[11] (*Id.*) On September 17, 2003, Dr. Songer completed a questionnaire in which

---

[10] A score of 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[11] A score of 41-50 indicates moderate symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social occupational, or school functioning (e.g., no friends, unable to keep a job).

he indicated that Plaintiff showed anxiety, worry, irritability, paranoia, and auditory hallucinations. (Tr. 354). He opined that Plaintiff had difficulty maintaining concentration and attention as well as adapting to stress and change. (Tr. 355). He further opined that Plaintiff had difficulty maintaining social relationships and would not react well to the pressures in a work setting even which involved simple and routine or repetitive tasks. (*Id*.) Dr. Songer completed another questionnaire on January 14, 2004. (Tr. 339-341). He reported similar findings to his prior questionnaire, noting Plaintiff's auditory hallucinations and persistent depression. (*Id*.) He also opined that Plaintiff was having trouble sustaining concentration and adapting to changes. (*Id*.)

Between January 21, 2004, when Plaintiff called Ms. Beard (her counselor at SBH) to report the birth of her daughter, and March 24, 2004, when she saw Ms. Beard, Plaintiff did not keep any appointments. (Tr. 472, 474). Plaintiff was "strongly advised" to get back on her medications, but on March 26, 2004, Dr. Songer reported that Plaintiff had not taken her medications since November 23, 2003. (Tr. 470). She was a "no show for March and April appointments and was terminated because she did not respond to phone calls or letters. (Tr. 465).

On September 21, 2004, Plaintiff returned to SBH seeking information about re-admission. (Tr. 461). Records indicate that Plaintiff returned "because her lawyer told her it would help her to get SSI." (Tr. 25). Plaintiff was scheduled to see Dr. Songer on October 20, 2004, but she cancelled at the last minute. (Tr. 456). She also cancelled her November 12, 2004 appointment, but saw Dr. Songer on December 2, 2004. (Tr. 449).

-9-

Then, after cancelling three straight appointments, Plaintiff saw Dr. Songer on January 17, 2005 (Tr. 440), before SBH again terminated Plaintiff due to poor attendance and lack of compliance with medications. (Tr. 482).

Dr. Songer also completed a Mental Functional Capacity Assessment on January 17, 2005. (Tr. 798-799). Dr. Songer opined, in part, that Plaintiff would be markedly limited in her ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and that she would be unable to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 798). Dr. Songer also remarked that Plaintiff would be moderately limited in many functional areas including difficulties with instructions, attendance, social interaction, and behavior. (*Id.*) He further noted that Plaintiff's symptoms include poor motivation, loss of interests, decreased energy, auditory hallucinations, and impulsive suicidal gestures. (Tr. 799). Ultimately, Dr. Songer opined that claimant is unemployable, although he hypothesized that claimant's limitations could be expected to last between 9 and 11 months. (*Id.*) It is important to note, however, that this assessment was completed 16 months after Dr. Songer's first questionnaire which indicated the presence of similar symptoms. (Tr. 354-355).

On December 16, 2005, Plaintiff was sent for another examination at the request of the State agency, this time with Dr. Meyers. (Tr. 388-396). Plaintiff again reported hearing voices, having thoughts of suicide, and being distracted. (Tr. 390-391). Dr. Meyers assigned Plaintiff a GAF of 45 and found that she was moderately to markedly

-10-

limited in hear ability to relate to others and withstand the pressures associated with day to day work activity. (Tr. 392-393). She further opined that Plaintiff was moderately impaired in her ability to maintain attention, concentration, persistence, and pace. (Tr. 392).

Plaintiff began mental health treatment at Eastway in March of 2006. (Tr. 914-1199). She continued to report symptoms of frustration, overwhelming stress, auditory hallucinations, depression, anxiety, and thoughts of suicide. (Tr. 914, 918, 922, 925, 959, 1021, 1052). In an Eastway assessment from August 13, 2009, Plaintiff was noted to exhibit a disturbed reality contact, was diagnosed with Schizophrenia Paranoid Type, and was assigned a GAF of 49. (Tr. 852, 854).

A counseling note dated September 9, 2008 written by Janel Leiber included Plaintiff's statement that she had been in California for a month, went to Disneyland, and used her own money to fly there and stay. (Tr. 990). Ms. Leiber described Plaintiff as being very manipulative and frustrated during the visit. (Tr. 990).

The record also contains Mental Functional Capacity Assessments from Dr. Toca, one of Plaintiff's treating physicians at Eastway. (Tr. 827-830). On September 30, 2009, Dr. Toca filled out the same form she had previously filled out in October 2007. (Compare Tr. 827-829). In 2009, Dr. Toca opined that claimant was markedly limited in seven separate functional areas including comprehension, attention, concentration, pace, reliability, and responding to changes. (Tr. 827). She further opined that Plaintiff was

-11-

moderately limited in a number of other vocationally significant areas. (*Id.*) Dr. Toca ultimately determined that Plaintiff was unemployable. (Tr. 828).

### Plaintiff's Testimony

Plaintiff testified (on April 14, 2010), that she had five children aged twelve, seven, six, four, and a baby who was three months old. (Tr. 1204). Plaintiff alleged that she had problems driving because she had difficulty reading street signs and knowing when to turn left or right. (*Id.*) Plaintiff testified that due to problems receiving her checks from the job center, she had to work on the side. (Tr. 1205). She said she did hair, nails, and some babysitting. (Tr. 1205). She also received pay for helping children of kindergarten age read kindergarten books. (*Id.*) Plaintiff maintained that she had trouble with reading and writing and could not read a newspaper. (Tr. 1206).

Plaintiff testified that she lost her cashier job due to a lay-off. (Tr. 1207). She identified "reading and comprehension" as her biggest obstacle to holding a full-time job. (*Id.*) Plaintiff identified additional problems that included: hearing voices; falling into depression; and feeling suicidal. (*Id.*) She described a typical day as getting up, taking the school-age children to at least two different schools, and then coming home and caring for the baby. (Tr. 1209). Plaintiff said that she heard voices on a daily basis, and that they mainly told her negative things. (*Id.*) She testified that she had attempted suicide more than ten times. (Tr. 1210).

-12-

**Testimony of the Vocational Expert**

Mr. Pinti classified Plaintiff's work as a cashier as light and semi-skilled, although

he said that he suspected that Plaintiff performed it at the unskilled level. (Tr. 1216).

The ALJ posed a hypothetical question asking about a person capable of working at any

exertional level, but limited to simple tasks that did not require reading or writing, and

which featured only a minimal degree of personal contact in the workplace and no

production quotas. (*Id.*) Mr. Pinti identified regional medium jobs including 2,000 jobs

as a warehouse worker, and 500 jobs as a floor waxer. (Tr. 1216-17). Mr. Pinti noted

that approximately 120,000 unskilled, medium jobs existed locally, and that the

hypothetical question would allow a person to perform approximately 15,000 of those

jobs. (Tr. 1217).

Plaintiff alleges that the ALJ erred by not applying the correct legal criteria to the

reports of two consulting examining psychologists.

Plaintiff criticizes the ALJ for not mentioning Dr. Jones, who performed a

consultative examination in 2002. (Doc. 7 at 14). Dr. Jones expressed limitations that

were not compatible with the record. For example, he opined that Plaintiff might have

difficulties relating to others, including co-workers and supervisors. (Tr. 294). Plaintiff,

however, worked for at least a year and a half as a cashier at a gas station and when

Plaintiff testified about difficulties on that job, she never suggested that she had any

trouble with customers, co-workers, or supervisors. (Tr. 691). Moreover, despite setting

-13-

out many significant limitations for Plaintiff, Dr. Jones opined that as long as she remained emotionally stable, Plaintiff could manage any benefits granted. (Tr. 294).

Dr. Myers, who reported Plaintiff's statement that she could not manage her funds, opined that Plaintiff could comprehend and complete simple, routine tasks. (Tr. 392). This statement is consistent with the ALJ's RFC finding. (Tr. 746). Additionally, Dr. Myers observed that Plaintiff did not show any comprehension problems during her interview. (Tr. 392).[12]

Accordingly, the record reflects that the ALJ properly considered the reports of the consulting psychologists when determining Plaintiff's RFC.

**B.**

Next, Plaintiff alleges that the ALJ erred in failing to apply the correct legal criteria to the opinions of two treating sources, Dr. Songer and Dr. Toca. Additionally, Plaintiff maintains that the ALJ improperly relied on presumptions and speculations and improperly determined Plaintiff's credibility. These issues are interrelated and will be considered together.

Dr. Songer found that Plaintiff was capable of performing simple work without significant limitation. (Tr. 743). Based on Dr. Songer's assessment, the ALJ determined that Plaintiff did not need a restriction to simple work. (*Id.*) Dr. Songer did express some

---

[12] In fact, the record reflects that much of Plaintiff's mental health treatment records are tied to general county support services because she was a single mother of young children and kept getting pregnant. (Tr. 31). There is no evidence of any significant counseling for purely psychological help, but rather meetings with social workers to help her obtain resources. (*Id.*)

concern about how Plaintiff might react to pressures in the work setting. (Tr. 355) However, the ALJ accounted for this concern by limiting Plaintiff to no production quotas. (Tr. 746). The ALJ also found that Dr. Songer was "ambivalent" on the issue of whether or not Plaintiff was disabled because she would not commit to stating that Plaintiff would be unemployable for twelve months or more. (Tr. 743). The ALJ reasonably contrasted these opinions with Plaintiff's ability to be the sole care-giver for her children, and her ability to work part-time and produce significant earnings in 2007-2009. (Tr. 743-44). Accordingly, the ALJ reasonably found that it would be improper to assign controlling weight to Dr. Songer's opinion. (Tr. 744).

Moreover, less than one year after his initial assessment of Plaintiff, Dr. Songer, in concert with other professionals at SBH, agreed to terminate Plaintiff from the program. (Tr. 466). In fact, the records indicate that after he filled out a form for Plaintiff on September 17, 2003 (Tr. 355-56), Dr. Songer saw Plaintiff on only two other occasions. Plaintiff saw Dr. Songer on November 12, 2003, when she recommended that Plaintiff "take meds as above." (Tr. 342). However, on March 26, 2004, Dr. Songer noted that Plaintiff had not been taking her medications since November 23, 2003. (Tr. 470). This was the only appointment that Plaintiff kept with Dr. Songer after the birth of the baby in January 2004. When Dr. Songer filled out the formal Discharge Summary on June 1, 2004, she noted that Plaintiff had a baby in January 2004, and that her attendance afterwards was poor. (Tr. 465).

-15-

Plaintiff's second attempt to receive services at SBH (and with Dr. Songer) was similarly unsuccessful. Although Plaintiff returned to SBH in September 2004, she maintained very sporadic attendance between that date and April 19, 2005, when Dr. Songer again terminated her from the program for poor attendance and lack of compliance with medications. (Tr. 482). The ALJ noted that Plaintiff showed that she was someone who "has an excellent ability to access social services and stay on top of getting forms and other input from those sources (for) her financial and housing needs." (Tr. 744).

Additionally, Plaintiff asserts that the ALJ unlawfully limited the weight given to two checklists filled out by Dr. Toca due to the ALJ's concerns about credibility. However, when the record is replete with examples of Plaintiff's exaggerations and misstatements, the ALJ may properly limit the weight given to a doctor who unquestionably accepts Plaintiff's allegations. "Subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Smith v. Astrue*, 639 F.Supp.2d 836, 856 (W.D. Mich. 2009).

The record contains "numerous examples" of Plaintiff's poor credibility. (Tr. 747). For example, a counselor's note from April 6, 2009, indicates that Plaintiff reported she was taking her medications, even though she ran out a month ago. (Tr. 952). *See, e.g., Hardaway v. Secy. of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987) (non-compliance with medications undermine a Plaintiff's credibility). On the same date,

-16-

Plaintiff told Ms. Leiber, her counselor, that she had made a new appointment after meeting with her doctor, but when Ms. Leiber checked, she learned that Plaintiff had not made any appointments. (Tr. 952).

Additionally, a December 2009 discharge summary from Good Samaritan Hospital discloses a number of inconsistencies – on admission Plaintiff stated that she had been most recently admitted to the psychiatric unit at Good Samaritan three times in 2004. (Tr. 890). The report, however, noted no hospitalizations in 2004, and stated that her most recent admission (prior to the current 2009 admission) occurred in 2002. (Tr. 890). Whether or not one considered two hospitalizations as "multiple hospitalizations," there is no question that Plaintiff, by talking about three admissions in 2004, when there were none, exaggerated her mental health treatment history. The Good Samaritan discharge summary from December 2009, also caught Plaintiff in a misstatement about her recreational drug use – although she said her most recent drug use was over a year ago, the hospital's drug screen revealed that she tested positive for marijuana. (Tr. 889). In fact, the report states, "[s]o therefore, the patient was not disclosing the entire truth." (Tr. 889).

It is undisputed that a claimant must follow recommended prescribed treatment and will be denied benefits if she fails to do so without good reason. 20 C.F.R. § 416.930(b). However, when dealing with mental disorders, a failure to seek or adhere to prescribed treatment may itself be a symptom of a disorder. *White v. Comm'r of Soc.*

-17-

*Sec.*, 572 F.3d 272 (6th Cir. 2009). While this Court recognizes this fact, there is no evidence in the record to support a finding that Plaintiff's failure to take prescribed medication or follow through with medical appointments is in any way related to a mental disorder. Plaintiff's non-compliance with treatment, her failure to keep appointments, and her tendency to exaggerate her symptoms are validly articulated reasons for not giving these doctors opinions controlling weight.

While Plaintiff may disagree with the ALJ's decision, his decision is clearly within the "zone of choices" afforded to him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference."). The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

-18-

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Rosalind Lawrence was not entitled to disability insurance benefits, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date: 12/5/11

Timothy S. Black
United States District Judge